No. 72,746

In the Matter of HENRY H. BLASE, *Respondent.*

(920 P.2d 931)

Opinion filed July 12, 1996.

*Stanton A. Hazlett*, chief deputy disciplinary administrator, argued the cause and was on the brief for the petitioner.

*Stephen E. Robison*, of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, argued the cause and was on the brief for the respondent, and *Henry H. Blase*, respondent, argued the cause pro se.

*Per Curiam:* This is an original proceeding in discipline filed by the Disciplinary Administrator's office against Henry H. Blase, of Wichita, an attorney admitted to the practice of law in Kansas. The complaint filed against respondent alleged a violation of Model Rule of Professional Conduct (MRPC) 8.4 (1995 Kan. Ct. R. Annot. 340).

Respondent filed an answer denying the allegations and challenging the sufficiency of the allegations.

A formal hearing before a panel of the Kansas Board for Discipline of Attorneys was held on August 24 and 25, 1994. Respondent appeared in person and by and through his attorneys, Stephen E. Robison and Mark F. Anderson, of Wichita.

There is general agreement concerning the facts which led to the filing of the complaint against respondent. There is disagreement as to respondent's intent.

Respondent was the owner of a 25 percent interest in Air Cap Truck Plaza, Inc. (Air Cap), a Kansas corporation, which operated a fuel stop adjacent to Interstate 135 in Park City, Kansas. The acreage on which this facility was built was deeded to Park City as security with the agreement that Air Cap could purchase it for $100 when the bonds were paid off. Shortly before the scheduled opening, the fuel center operator backed out. The principals of Air Cap decided to operate the fuel center. In order to purchase the fuel dispensing equipment, the canopies, and the interior furnishings,

which the lessee operator had been required to provide under the lease agreement, Air Cap obtained a revolving line of credit from Mid Kansas Federal Savings and Loan Association (Mid Kansas) for $495,000. It was secured by a mortgage on the remaining 64 acres, which were adjacent to the development. In May 1986, Blase Mancine was hired to run the fuel center.

A letter of credit for $150,000 was obtained from Mid Kansas for fuel purchases from Texaco. It was personally guaranteed by the directors, respondent, Robert Blase, Rodger Moran, and Paul Feleciano. The Texaco account fell into arrears, and in July 1987, Texaco called approximately $85,000. Mid Kansas paid that amount to the fuel supplier. When the bank demanded payment from the guarantors, Robert and respondent each paid one-fourth of the approximate $85,000, but Moran and Feleciano refused to pay on the ground that it was a corporate rather than a personal obligation.

In 1984, Laura Jeanne Blase (Jeanne), respondent's wife, began helping with the bookkeeping for Air Cap. She testified that after Texaco called the $85,000, the fuel center was required to pay for fuel upon delivery. Because checks written on the corporate operations account had to be signed by two directors, it was not feasible to pay the fuel supplier from that account. A fuel account on which Mancine could write checks was opened for that purpose. She also testified that Mancine had an agreement with the supplier that the check would be held for 7 days before being deposited. Because Mancine recorded the check when it was given to the supplier and deducted it from the balance, the account had a constant negative balance.

The first fuel account, on which Mancine was the sole signatory, was closed by the bank due to overdrafts. A fuel account then was opened at Chisholm Trail State Bank (Chisholm Trail). Mancine and respondent were authorized to sign fuel account checks, but only one signature was required. Receipts from the sale of fuel and items from the convenience store were deposited into the fuel account, and the fuel supplier was paid out of it. The receipts for fuel paid on open charge accounts and truckers' credit card companies were received in the corporate office and deposited into the Mid Kansas account. During the first 6 months of 1988, approximately

four or five checks a month were drawn on the Mid Kansas operations account in order to transfer money to the Chisholm Trail fuel account. Occasionally, there would be a transfer from the fuel account to the operations account.

On Friday before the July 4th weekend in 1988, Mancine contacted Jeanne for a transfer to the fuel account. She initially refused because there was not enough money in the operations account to pay the bills and transfer money for fuel. Mancine convinced her by saying he would hold the operations account check until just before the banks closed on Friday and would deposit a fuel account check in the Mid Kansas account first thing on Tuesday. According to Jeanne, this was the first instance in which advantage was taken of the time required by the banks for processing transfers. The same thing occurred on Friday, September 2, in connection with the Labor Day weekend. The checks written on the operations account on those two occasions were approximately $6,000 each.

On September 26, Mancine asked Jeanne to transfer money from the operations account to the fuel account. She initially refused on the basis that the money in the operations account was earmarked for other needs. Mancine convinced her by saying that he would have to close the business. She gave him a $7,000 third-party check which otherwise would have been deposited in the operations account and a $4,000 check written on the operations account. He did not deposit a corresponding amount into the operations account the following morning, as promised, but on September 28 he did. Mancine immediately asked for another transfer from the operations account and promised to pay it back the next day. The next day he gave Jeanne a check from the fuel account, which repaid the previous transfer, and asked for another check from the operations account.

The pattern continued, and the number and amounts of the checks escalated. When the amounts to be drawn from the operations account exceeded $10,000, Mancine told Jeanne to make more than one check so that the bank would not be required to report the draw to the Internal Revenue Service.

In a memorandum dated November 17, 1988, Jeanne called to the attention of the directors of Air Cap the ever-growing practice

of transferring money from one account to another. She began by showing negative bank balances in each of three accounts (fuel, operations, and imprest) as of October 31 and negative checkbook balances in two of the three accounts on November 14.

Examination of the transfer checks written on the Mid Kansas account from October through March, when the accounts were closed, shows that all but the first check, which is numbered 10220 and dated October 3, 1988, were signed by respondent. The first check has only Robert's signature.

There were 28 more transfer checks written on the Mid Kansas account in October 1988, and all but 5 were signed by respondent and Robert. During November 1988, the number of transfer checks written on the Mid Kansas account rose to 80. Checks dated through November 15 are cosigned by Robert. He died of cancer on November 28 after spending much of the fall of 1988 in the hospital, where respondent visited him every day. Beginning with checks dated November 16 and through mid-December, the second signature on the transfer checks often was supplied by Mancine. Insofar as the record shows, Mancine was not authorized to sign checks drawn on the Mid Kansas operations account. Moran cosigned eight checks in November 1988.

The number of checks written to the Chisholm Trail fuel account from the Mid Kansas operations account increased in each succeeding month through February 1989. On checks written in December 1988 and January and February 1989, respondent's signature is paired as follows: On checks written in December, with the signatures of Moran, Feleciano, and Mancine; in January, with the signatures of Moran and Feleciano; in February, with the signatures of Moran, Feleciano, and, on one check, Robert's wife, Dorothy Dee Blase (Dee). In March, Dee's signature, followed by "Director," appears several times. There is an undated signature authorization for her in the record.

A grand jury indictment against respondent and Mancine was filed in the United States District Court for the District of Kansas (Wichita Docket) in January 1992. Each was charged with one count of conspiracy to execute a scheme to defraud federally insured financial institutions; one count of executing a scheme to

defraud Chisholm Trail, which resulted in a loss of approximately $66,862.78; and one count of executing a scheme to defraud Mid Kansas, which resulted in a loss of approximately $88,010.28. Mancine entered into a plea agreement which included his testifying against respondent. Respondent was tried twice. The jury deadlocked each time, and, on September 30, 1992, the charges against him were dismissed.

When interviewed by F.B.I. agent Randall Wolverton, respondent's position was that, even though the check-kiting activity might be illegal, he had not committed a crime because he did not intend to defraud the banks. Respondent stated that he knew that the banks were losing money and that the loss in mid-November would be approximately $40,000 to $50,000, but that he placed a self-imposed ceiling of $100,000 on the losses he would allow the banks to sustain. Respondent "explained that if the loss situation reached or exceeded $100,000, that he would call the banks, put a stop to the activity, and actually take his own money that had been set aside in an annuity program to repay the banks, even though this was a corporate debt." Jeanne testified that sometime before March 1989, respondent confided in her that he would let the scheme go on until it reached about $100,000, at which time he would no longer be involved in it. He told her that if there was a problem, he would use his annuity. According to Agent Wolverton, the combined losses of the banks exceeded $100,000 on December 20, 1988. Respondent was basing his $100,000 stopping point "on the amount outstanding from the Mid Kansas account on a daily basis."

Respondent told Agent Wolverton that he monitored the operations account at Mid Kansas and that the loss figure was approximately $90,000, that is, short of his self-imposed limit, when the activity was stopped. Respondent also indicated that he believed that the banks were aware of the activity and acquiesced in it.

As respondent related to Agent Wolverton when first interviewed, the basis for his belief that Chisholm Trail was aware of the check-kiting activity was that it charged a fee on an uncollected balance. Respondent testified that Jeanne's memorandum of November 17, 1988, alerted him to the exchange of checks between

the fuel account and the operations account. To find out why it was happening, he talked to Jeanne about how the practice started and looked at the bank statements for each account. Noticing that the service charge on the Chisholm Trail account had increased significantly in October, respondent checked the account agreement and read that an 18% interest charge is assessed on negative collected balances. Respondent testified that he believed that Chisholm Trail knew that its money was being used and was charging interest on that use.

With regard to Mid Kansas, respondent testified that it was "pretty clear" to him "what was going on" and that he could not imagine that the bank did not know. Respondent first told Agent Wolverton that he believed any bank officer could see the amount of activity in the Mid Kansas account. On the Mid Kansas statement, there was what respondent described as "what appeared to be a statement of the account on practically a daily basis." It seemed unusual to him and contributed to his belief that Mid Kansas knew what was going on. Eventually respondent's explanation of why he did not intend to defraud Mid Kansas came to include the concept of that bank's being secured against loss as a result of security which had been pledged in connection with existing loans. Respondent noted that Mid Kansas held the mortgage on the undeveloped adjacent acreage as security for the revolving line of credit which, by November 1988, had been paid down from $495,000 to approximately $150,000.

Respondent testified that he brought up Jeanne's memorandum, which had been made available to each director in advance, for discussion at the board meeting on November 23, 1988. In addition to respondent, Moran, Feleciano, and John Vetter, a Wichita attorney and certified public accountant who had been appointed to the board in May 1988, were present. The minutes of the meeting are not in the record. Respondent testified that during the new business portion of the meeting, he held up a copy of the memorandum and said, " 'What are we going to do about these transfers?' . . . The only response was from Feleciano, who stated, 'Don't look at me, I don't have any money.' " Respondent found it very significant that Vetter did not express concern about the trans-

fers. It was agreed, according to respondent, that a work session would be held the following weekend for the purpose of "get[ting] into it and find[ing] out what we could do to stop the practice of transferring checks."

At the work session respondent, Moran, and Feleciano settled on a two-part strategy. They would work with Mancine to improve his operating procedures in the hope that spending could be cut and deposits could be increased. In addition, they actively would seek to sell some of the undeveloped land. Respondent expected positive results. Mancine had assured respondent before the board meeting that his operation could generate the needed income "within a very short period of time," which respondent interpreted as "within a couple of weeks." And during the fall of 1988, Air Cap had closed on two land sales comprising three acres for $355,000.

Knowing that there was no actual money supporting the checks, respondent continued to actively participate in the transfers by signing Mid Kansas checks. At some point the amount began to be left blank on transfer checks presented for signature, and respondent continued to sign them. As noted, many of the Mid Kansas transfer checks which were issued in November and December bore Mancine's signature along with respondent's. Respondent admitted that he knew of no purpose for a check kite other than to artificially inflate an account balance so that it appears there is money even though there is none. Respondent testified that he knew that check kiting was illegal and that he never thought of Air Cap's practice as check kiting, "although the concept of the checks going back and forth in the manner that I saw them being described to me [in the November 17 memorandum] would certainly indicate that." Respondent also said, however, that he trusted Mancine to act in the corporation's best interests. When asked, "And did you trust him to make sure that the kite was run appropriately?" respondent answered, "Well, I continued to sign the checks, so I guess you could say yes."

When the accounts were closed in March, respondent and Moran went to Mid Kansas to talk with officials. Mid Kansas proposed a new extension of credit in the amount of $135,000, which would include the bank's loss from the kite and the amounts still

unpaid by Feleciano and Moran on their personal guarantees of the letter of credit for Texaco. Respondent refused to sign the note because it would have had the effect of transforming the personal liabilities of Feleciano and Moran into a corporate liability even though Air Cap had not made any accommodation for corresponding amounts paid by respondent and Robert.

Respondent and Feleciano went to Chisholm Trail to talk with officials. Chisholm Trail offered to make a loan to Air Cap in the amount of the loss sustained by the bank. Feleciano and Moran refused to sign the note unless respondent signed the Mid Kansas note. Dee and respondent signed the note with Chisholm Trail and secured it with personal assets. At the time of the disciplinary proceedings in August 1994, the Chisholm Trail loss had been paid, but the Mid Kansas loss was outstanding.

The Disciplinary Administrator contended that respondent violated one or both of subsections (c) and (g) of MRPC 8.4. MRPC 8.4(c) provides: "It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation." MRPC 8.4(g) provides: "It is professional misconduct for a lawyer to . . . engage in any other conduct that adversely reflects on the lawyer's fitness to practice law."

The hearing panel found:

"There does not appear to be a substantial dispute regarding the facts established by the evidence presented by the parties. It appears that the disputes or differences involve what conclusions might reasonably be drawn from the evidence, most specifically including conclusions regarding the respondent's intent or state of mind.

"The Panel feels that the evidence in this case presents a close question, and the panel struggled with the issues presented for decision. However, having reviewed and considered all of the evidence presented and the parties' respective theories and arguments, the Panel is unable to find by clear and convincing evidence that the respondent violated either of the rules relied upon herein.

"While it might reasonably be argued that at any particular point in time the respondent's involvement as a participant in the kiting scheme evidences an intent to mislead or deceive the bank, the Panel is not clearly convinced that the respondent intended ultimately to deceive, defraud or cheat the bank in any way."

Accordingly, the panel concluded that "the charges against the respondent herein be dismissed with no costs assessed to the re-

spondent, and this formal complaint is hereby dismissed." The Disciplinary Administrator appealed pursuant to Supreme Court Rule 211(f) (1995 Kan. Ct. R. Annot. 211) from the final hearing report of the panel dismissing the complaint against respondent. On September 15, 1995, this court heard arguments on the Disciplinary Administrator's appeal.

With regard to the standard of review to be applied when an appeal is taken from the decision of a disciplinary hearing panel, in *In re Carson*, 252 Kan. 399, 406, 845 P.2d 47 (1993), the court stated:

"In *State v. Klassen*, 207 Kan. 414, 415, 485 P.2d 1295 (1971), we explained that we have a 'duty in a disciplinary proceeding to examine the evidence and determine for ourselves the judgment to be entered.' In *State v. Zeigler*, 217 Kan. 748, 755, 538 P.2d 643 (1975), this court stated that, although the report of the disciplinary board 'is advisory only, it will be given the same dignity as a special verdict by a jury, or the findings of a trial court, and will be adopted where amply sustained by the evidence, or where it is not against the clear weight of the evidence, or where the evidence consisted of sharply conflicting testimony.' See *In re Farmer*, 242 Kan. 296, 299, 747 P.2d 97 (1987)."

The Disciplinary Administrator built its appeal of this issue on two federal criminal cases—*United States v. Frydenlund*, 990 F.2d 822 (5th Cir. 1993), and *United States v. Stone*, 954 F.2d 1187 (6th Cir. 1992). Both involve convictions for check kiting which were obtained and affirmed despite defendants' denials of intent to defraud the banks. Respondent ignored the cases cited by the Disciplinary Administrator. It was his position that professional misconduct within the meaning of Rule 8.4(c) must be intentional wrongdoing and "[c]onduct that does not indicate a specific intent or knowing calculation to do wrong is not within the rule's prohibition." Respondent urged this court to uphold the panel's decision on the ground that "he did not have the requisite wrongful intent."

As the Disciplinary Administrator argued, there are a number of aspects of these federal cases which are mirrored in the present case. Notwithstanding the failure of two juries to convict respondent of the federal offenses of bank fraud and conspiracy to defraud, it probably also is accurate to state that the evidence presented to the hearing panel "would have been sufficient to sustain

a criminal conviction had the respondent been convicted and appealed that conviction." Respondent knowingly participated in the check-kiting scheme. He knew its effect would be to artificially inflate the account balances, thereby causing the banks to honor checks drawn against accounts with insufficient funds and temporarily placing the bank's funds at the disposal of the account holder. He knew its effect would be losses for the banks, and he admitted monitoring the loss of Mid Kansas. The Disciplinary Administrator argued, therefore, that because the burden of proof is less onerous for disciplinary than for criminal proceedings, the hearing panel erred "in finding that there was a lack of clear and convincing evidence" of respondent's violation of MRPC 8.4(c). Respondent served as First Assistant District Attorney of Sedgwick County from 1981 to 1989. In 1989, respondent became Sedgwick County Counselor. The Disciplinary Administrator suggested that we should consider the fact of respondent's holding these positions while he was "kiting checks" to be a factor in judging his conduct.

The hearing panel did not conclude that the banks were aware of the check-kiting activity before the accounts were frozen. It found that "a simple review of the banks' own records would have readily exposed what was happening, and the bank witnesses admitted as much." Because the panel concluded that the banks so easily could have known, it was not persuaded that respondent unreasonably assumed that they did know.

The panel seems to have concluded that respondent's repaying the loss to Chisholm Trail demonstrates his lack of intent to permanently deprive the bank of its money. There is nothing in subsection (c) of MRPC 8.4, however, which indicates that conduct involving dishonesty, fraud, deceit, or misrepresentation necessarily includes the element of intending permanent deprivation. Nor has any authority for this proposition been brought to the court's attention.

If respondent's conduct is to be condoned on the ground that he did not intend to deprive the bank of its money permanently, the length of time which the unauthorized loan remained unpaid should be considered. The evidence showed that the $88,000 loss to Mid Kansas was still outstanding at the time of the disciplinary

hearing in August 1994. That was 5½ years after the accounts were closed. Respondent's stated reason for not having entered into a repayment agreement with Mid Kansas was that the bank had included in the amount to be repaid what the corporation still owed on the letter of credit which had been called by Texaco in 1987. It is understandable that he did not want to pay what he viewed as the personally guaranteed obligations of Feleciano and Moran. These circumstances, however, typify the perils of using another's money without authorization. Respondent created a significant, unbargained-for risk for Mid Kansas irrespective of his disavowal of any intent permanently to deprive the bank of its money.

Respondent contended that the bank's mortgage on the land adjacent to and near the fuel center development protected it from risk. That determination should be the bank's, not respondent's. His rationalization of the sustained and elaborate check-kiting scheme in which he actively participated cannot alter the activity's being unknown, unauthorized, and unnegotiated by Mid Kansas. The bank's holding a security interest in the land from which Air Cap projected making a profit did not entitle respondent to engage in the illegal activity of check kiting.

For the purpose of this court's review, the final report of the disciplinary panel will be adopted if it is amply sustained by the evidence or not against the clear weight of the evidence. In this case we concluded, after a thorough examination of the testimony and exhibits presented by the Disciplinary Administrator, that there was clear and convincing evidence that respondent engaged in conduct involving dishonesty, fraud, deceit, and/or misrepresentation, thereby violating MRPC 8.4(c). Respondent admitted actively participating in the illegal check-kiting scheme. The evidence supported neither his contention that the banks knew that he was kiting checks nor that it was reasonable for him to presume that they knew. The evidence came much closer to sustaining his stance that he had no intention that either bank should sustain a loss as a result of the illegal activity. This latter contention, however, as a matter of law, did not cancel the violation.

We agreed with the panel that respondent did not violate MRPC 8.4(g) and affirmed the panel's dismissal of that complaint. We

reversed the panel's dismissal of the complaint against respondent for violating MRPC 8.4(c) and found by clear and convincing evidence that respondent did violate MRPC 8.4(c).

Due to the panel's dismissal of the formal complaint, neither the respondent nor the Disciplinary Administrator had an opportunity to address the question of discipline. Nor did respondent have the opportunity to present evidence in mitigation of discipline. Following this court's reinstatement of the complaint concerning the MRPC 8.4(c) violation, respondent moved that the matter be remanded to the panel for consideration of mitigating or aggravating circumstances and to make a recommendation as to the discipline to be imposed. The motion was granted on October 19, 1995.

Upon remand, the panel, after hearing evidence, recommended that respondent be disciplined by "formal admonition" and that the costs of the proceedings be assessed against him. The Disciplinary Administrator had recommended and continues to recommend that respondent be disciplined by published censure pursuant to Supreme Court Rule 203(a)(3) (1995 Kan. Ct. R. Annot. 191). Thus, the Disciplinary Administrator submitted the matter to this court for the determination of appropriate discipline.

In response, respondent filed a motion to remove the case from the docket for lack of appellate jurisdiction. The Disciplinary Administrator filed a reply requesting "that the matter be retained on the . . . docket . . . or, in the alternative, that the [Disciplinary Administrator] be given additional time in which to file an appeal to the panel's finding of informal admonition." Respondent's motion was denied on May 3, 1996.

The panel made the following findings:

"[W]ith respect to considerations of aggravation, the panel finds as follows:

1. Pursuant to the Supreme Court's finding of a violation of MRPC 8.4(c), the respondent was guilty of a dishonest motive.

2. There was a pattern·with respect to the subject activity.

"With respect to considerations of mitigation, the panel finds as follows:

1. Respondent has no prior disciplinary record.

2. Whatever respondent's motive, there was no intention to illegally retain or convert monies not belonging to him. (see *State v. Scott*, 230 Kan. 564 at page 571)

3. Respondent made a timely good faith effort to make restitution. One bank has been repaid in full. Respondent has offered to execute a note and pledge collateral to the other bank.

4. Respondent has fully cooperated in the disciplinary process and has repeatedly expressed sincere remorse for his actions.

5. The subject conduct did not involve the practice of law.

6. Respondent is of good character and enjoys a good reputation in his community and among his peers as evidenced by numerous letters of support and of the testimony of U.S. District Court Judge Patrick Kelly, Sedgwick County District Judge Clark Owens, Sedgwick County Undersheriff Earl Wathen and past KBA president Jack Focht.

[7]. Respondent's father died during the time period in question. In addition to the obvious familial loss the panel notes that respondent practiced law with his father and relied upon his counsel and advice during trying times.

8. Respondent has suffered other 'penalties or sanctions' resulting from the subject conduct including the cost, expenses, trauma, adverse publicity and attendant stress and strain of two (2) federal criminal trials and this disciplinary action, since March or April 1989 and continuing to the present.

9. Respondent has repeatedly expressed heartfelt remorse for his conduct and the resulting trouble and inconvenience to others.

10. The complainant was apparently a business partner with interests adverse to respondent, and the panel received no statement from said complainant."

Noting that the Disciplinary Administrator recommended published censure and respondent's counsel suggested informal admonition, the panel stated its recommendation:

"The panel believes that the respondent's conduct herein is the type which may find ample redress in the criminal and civil laws and exhibits none of the elements of moral turpitude, arising, rather, from the infirmities of human nature. The panel does not feel that the respondent's conduct herein is the appropriate subject matter of a solemn reprimand by the Supreme Court. (in re *Johnson*, 106 Ariz 73, 471 p.2d 269) [*sic*] Accordingly, based upon ABA standard 5.14, the panel unanimously recommends that respondent should be disciplined by formal admonition and should be required to pay the costs herein, as properly certified by the Disciplinary Administrator."

One member of the panel filed a concurring report. The concurring panel member reached the same conclusion with regard to the recommended sanction as did the other panel members. Her report adds some emphasis to descriptions of the hardships experienced by respondent and his family as a result of his involvement in the check-kiting scheme.

Rule 203(a) does not identify formal admonition as a type of discipline. It is not clear what the panel intended by recommending a type of discipline which is not listed in Rule 203(a). With its recommendation of formal admonition, the panel may have been trying to find a middle ground between the published censure recommended by the Disciplinary Administrator and the informal admonition recommended by respondent's counsel. If so, subsection (5) of Rule 203(a) provides room for customizing a form of discipline. It might also be that the panel took the word "formal" from the text which accompanies the ABA Standards for Imposing Lawyer Sanctions. The panel stated that its recommendation was based on "ABA standard 5.14," which states: "Admonition is generally appropriate when a lawyer engages in any other conduct that reflects adversely on the lawyer's fitness to practice law." ABA Standards for Imposing Lawyer Sanctions, Black Letter Rule 5.14, p. 12 (1991). There is no commentary on Rule 5.14. Black Letter Rule 2.6, p. 8, provides: "Admonition, also known as private reprimand, is a form of non-public discipline which declares the conduct of the lawyer improper, but does not limit the lawyer's right to practice."

In their filings in this court since the panel's report on discipline, neither the Disciplinary Administrator nor respondent has offered reasons why the court should or should not accept the panel's recommendation. The Disciplinary Administrator states that published censure "remains the Disciplinary Administrator's recommendation." The only suggestions offered by respondent pertain to jurisdiction.

We have carefully reviewed the record herein and the recommendation of the panel. In view of the evidence presented to the panel, we concur with the Disciplinary Administrator and conclude that respondent should be disciplined by published censure.

IT IS THEREFORE ORDERED that Henry H. Blase be censured in accordance with Supreme Court Rule 203(a)(3) for violation of MRPC 8.4(c).

IT IS FURTHER ORDERED that this order shall be published in the official Kansas Reports and that the costs be assessed to respondent.

LOCKETT and ABBOTT, JJ., not participating.

ROBERT H. MILLER, Chief Justice Retired, assigned.