No. 84,256

In the Matter of CHRISTOPHER E. LUCAS, *Respondent.*
(7 P.3d 1186)

Opinion filed July 14, 2000.

*Frank D. Diehl*, deputy disciplinary administrator, argued the cause, and *Stanton A. Hazlett*, disciplinary administrator, was with him on the formal complaint for petitioner.

*Daniel F. Church*, of McAnany, Van Cleave & Phillips, P.A., of Lenexa, argued the cause, and *Carl A. Gallagher*, of the same firm, was on the brief for respondent. *Christopher E. Lucas*, respondent, argued the cause pro se.

*Per Curiam*: This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against Christopher E. Lucas of Overland Park, an attorney admitted to the practice of law in Kansas. The formal complaint filed against respondent alleges violations of KRPC 1.15 (1999 Kan. Ct. R. Annot. 342) and 8.4 (1999 Kan. Ct. R. Annot. 399). Respondent filed an answer denying violations of the Kansas Rules of Professional Conduct.

A hearing before the panel of the Kansas Board for Discipline of Attorneys was held on January 6 and 19, 1999. Respondent appeared in person and by counsel, Daniel F. Church and Carl A. Gallagher, of McAnany, Van Cleave & Phillips, P.A. The panel found that the following facts were established by clear and convincing evidence:

"3. Daniel Stuart entered into an unwritten agreement to practice law together, sharing income and expenses, with Respondent. The name of their business relationship was Stuart and Associates, and later was changed to Stuart and Lucas.

"4. Stuart began clerking for Respondent before Stuart passed the bar. Then, Stuart and Respondent began their 'partnership,' which they named Stuart and Associates. Respondent's name was not initially used in the firm name because, at the time, Respondent was still working for another firm named Bodker and Associates, Inc.

"5. Stuart and Associates opened bank accounts at the Metcalf State Bank, trust account number 1057200 and operating account number 1057057.

"6. In the fall of 1994, another lawyer named Ki Mun began practicing with Stuart and Associates. However, in January 1995, he was asked to leave because he was not 'generating sufficient revenue.'

"7. Stuart testified that there was an unwritten agreement between Stuart, Mun and Respondent for a three-way split of the proceeds and expenses of the firm, 'Oh, it was always a third, a third and a third.' When asked if they handled clients separately, Stuart testified, 'No, we all had clientele that we all maintained as a firm . . . . If anybody brought in a client, it was expected that all three of us would benefit from any revenues or proceeds from that particular client.'

"8. Sometime after Mun left the firm, Timothy Rogers joined Stuart and Respondent.

"9. Stuart testified that the arrangement between himself and Respondent, while they were practicing together prior to the addition of Mun or Rogers, was a '50 - 50 partnership.'

"10. According to Rogers, the business arrangement between Respondent, Stuart and Rogers involved the purchase of office furniture and equipment from the firm's Boatmen's Bank line of credit; all property was 'owned equally,' and 'Everything [was to be shared] a third, a third, a third.'

"11. According to Stuart, the business arrangement between Respondent, Stuart and Rogers was, 'Everybody would share in running the firm . . . . We did everything equally. Everything was split a third, a third, and a third whether it was paying, receiving or otherwise, regardless of who brought in the account or client or where the client came from.'

"12. Although Respondent claims that the respective arrangements of Stuart, Mun and Rogers were in the nature of sole proprietorship, with no agreement among the parties to share income and expenses on an equal basis, Mr. Stuart and Mr. Rogers testified exactly opposite. Mr. Mun was not a witness.

"13. On June 1, 1995, Stuart and Associates moved to 8101 College Boulevard in Overland Park, Kansas. When the law office moved, the firm opened new bank accounts at Boatmen's Bank and the lawyers in the firm discussed the closing of the trust and operating accounts at Metcalf State Bank.

"14. Daniel Stuart and Respondent were the persons authorized to write checks on the Metcalf accounts. Timothy Rogers, who later joined Stuart and Associates, was not so authorized.

"15. Respondent was in charge of closing the old accounts at Metcalf State Bank. In late 1995, Respondent assured . . . Daniel Stuart and Timothy Rogers that he had closed the Metcalf accounts .

"16. In mid to late 1996, Daniel Stuart and Timothy Rogers confronted Respondent about the Metcalf bank accounts. They asked Respondent why the Metcalf bank accounts were still open. Respondent initially denied they were still open but then admitted they were. Respondent said he had been using the accounts as a receptacle for deposits of his 401(k) funds and loans from his family. Respondent said he deposited those funds because he did not want his wife to know that he was receiving them.

"17. Timothy Rogers acted as bookkeeper for the firm. He had asked Respondent to provide him with information concerning the closing of the Metcalf accounts and had asked Respondent on several occasions for the bank statements, canceled checks, and deposit slips from those accounts. Rogers believed that the Metcalf bank accounts had been closed in June 1995. Respondent told Rogers at one point that he could not find the bank statements and [that] Rogers would have to 'guesstimate' the closing amounts of the Metcalf accounts.

"18. Rogers found the missing Metcalf bank statements in Respondent's office and discovered the Metcalf accounts still open into the year of 1996. Daniel Stuart and Timothy Rogers then closed the Metcalf accounts and further discovered that money had been deposited in the Metcalf account for approximately another year, beginning June 1, 1995.

"19. Respondent had been receiving mail from the former address of the firm (10999 Metcalf). Rogers learned that Respondent had changed the mailing address for delivery of the Metcalf bank statements to Respondent's home address, rather than the new office address.

"20. When Stuart and Rogers confronted Respondent about the allegedly closed Metcalf bank accounts, Respondent initially denied that they were open, then admitted they actually were open and that Respondent had been using them 'for my money,' including 401(k) plan funds and loans from family.

"21. Copies of the checks deposited into the Metcalf Bank accounts without the knowledge of Stuart or Rogers showed no 401(k) funds or loans from family; rather, they were all case settlements, collection work, referral income and court-appointed case fees.

"22. Daniel Stuart and Timothy Rogers again confronted Respondent about the accounts. Respondent denied that he was taking money from the firm accounts. However, Respondent eventually admitted that he had been retaining fees from firm cases when he was confronted with documentation including the Metcalf Bank statements, copies of canceled checks and the spreadsheet prepared by Rogers. As described by both Rogers and Stuart, Respondent 'broke down' and acknowledged wrongdoing.

"23. Respondent signed others' names to endorse checks made out to other lawyers in Stuart and Associates and then deposited the checks into an account (at Metcalf State Bank) which the other lawyers did not know was still open and from which they were no longer drawing funds.

"24. An unwritten agreement existed between Respondent, Stuart and Rogers, and between Respondent, Stuart and Mun (during the time Mun practiced with them) to share income and expenses equally. As to the unwritten agreement between Respondent, Stuart and Rogers, Respondent breached the agreement. It is not necessary for this panel's purposes to reach a finding as to the exact nature of the legal entity created by that agreement. Respondent used firm funds deposited into the Metcalf State Bank for his own purposes and did not share the funds with Daniel Stuart or Timothy Rogers. Neither Daniel Stuart nor Timothy

Rogers had access to the allegedly closed Metcalf State Bank accounts, due to Respondent's misrepresentation that the accounts had been closed.

"25. After Stuart filed this complaint with the Disciplinary Administrator, Respondent asked Stuart to 'lie' for him and state some things 'differently.'

"26. The firm's letterhead indicated Respondent is a certified public accountant, whereas he has not fulfilled the requirements necessary for that title.

"27. Letterhead used by Stuart and Associates described the business entity as a Limited Liability Company (L.L.C.) and the firm's name shown on the Metcalf State Bank account and corresponding checks was 'Stuart and Lucas, LLC.'

"28. The checks used by the firm during the time Respondent, Stuart, and Ki Mun worked together listed the account name as, 'Stuart, Lucas and Mun, LLC.'

"29. The firm's I.R.S. taxpayer identification number (#48-1152434) was assigned to Stuart and Lucas LLC.

"30. In applying for a line of credit with Boatmen's Bank, the firm's name was listed as Stuart and Lucas LLC.

"31. These representations of LLC status were made despite the failure to file with the Kansas Secretary of State the paperwork statutorily required to establish an L.L.C."

## The panel made the following conclusions of law:

"Respondent admitted having violated Kansas Rule of Professional Conduct 1.15 regarding the proper placement of client funds. The panel accepts the admission.

"The panel also finds that the above-stated facts constitute, by clear and convincing evidence, a violation of KRPC 8.4(c), which states: It is professional misconduct for a lawyer to: . . . (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' "

## The panel found the following aggravating factors:

"(b) Dishonest or selfish motive. It is clear from the evidence that Respondent was utilizing money earned by various members of the firm for his own use and hid that from his associates.

"(c) Pattern of misconduct. It appears this behavior went on for several months before being discovered by Mr. Rogers.

"[(d)] Submission of false evidence, false statements or other deceptive practices during the disciplinary process. Because the panel accepts as true the testimony of Mr. Stuart and Mr. Rogers as to the informal agreement for distribution of expenses and funds on an equal basis and accepts as true their testimony concerning Mr. Lucas' behavior and statements after confronted with the knowledge of wrongdoing, and considering the fact that Mr. Lucas testified that none of these things were accurate, the panel presumed he must be submitting false evidence.

"[(e)] Refusal to acknowledge wrongful nature of the conduct. As of the time of the hearing, and even in the submission in mitigation, the Respondent repeat-

edly refused to acknowledge any wrongful conduct on his own behalf, other than with respect to the violation of 1.15, which was admitted in his answer.

"[(f)] Indifference to making restitution. There has never been any evidence of any attempts at restitution or any offers of restitution by respondent.

"[(g)] Illegal conduct. Converting money to his own use that was directed to the firm for legal work."

Respondent's inexperience and absence of a prior disciplinary record were found to be mitigating factors. The panel concluded:

"In this case, the finding of a violation of 8.4(c) is not a finding directed toward a client, but, rather, to the lawyer's own firm or 'partners.' In effect, Respondent stole from his firm and converted the money to his own use. It is found that his actions were intentional and were intended to deceive and be secretive. There was no evidence concerning the actual total amount stolen. However, it is clear that a willingness to take funds not belonging to him shows a dishonesty which could very well at some point cause direct client harm. In this case, the direct harm occurred to this partners.

"The aggravating factors involved far outweigh the mitigating factors and as a result, the panel recommends discipline of a two-year suspension from the practice of law. The panel further recommends that as a condition of reinstatement, the Respondent shall make restitution in an amount agreeable to Complainant and Tim Rogers, or an amount determined by an appropriate Court of competent jurisdiction."

Respondent filed exceptions to the report of the hearing panel, summarized as follows:

Paragraphs 7 and 9. Respondent disputes Stuart's testimony that they agreed to share proceeds equally. He cites the lack of any documentary evidence of an agreement.

Paragraph 10. Respondent disputes Rogers' testimony that they agreed to share equally. He notes that Rogers was not yet licensed when security and lease agreements were signed.

Paragraph 11. Respondent disputes Stuart's testimony that they agreed to share proceeds equally. He cites copies of checks written on the firm account and on the firm's trust account, a capital account summary, and a summary of income/cash flow/draws. The point he wants to make with the documents is that the lawyers' draws were not equal. In the capital account summary, the draws are shown for Rogers, Stuart, and Lucas as $15,623 and $26,860 and $43,794, respectively.

Paragraph 13. Respondent denies that he and Stuart discussed closing the existing business bank accounts with Metcalf State Bank at the time they moved offices.

Paragraph 15. Respondent denies that he was in charge of closing the old accounts and that he told Stuart and Rogers he had done so. He directs the court's attention to a check he wrote to himself on the new trust account at Boatmen's Bank and deposited in an account at Metcalf State Bank. He asserts that Rogers would have seen this check when he reconciled the Boatmen's account.

Paragraphs 16 and 20. Respondent states that he denies "these allegations." The findings of these paragraphs are based on Stuart's and Rogers' testimony concerning respondent's response when they confronted him about not closing the old bank accounts.

Paragraphs 17 and 18. Respondent disputes that Rogers could have believed, as a practical matter, that the old accounts were closed. Respondent asserts evidence that the accounts remained open was readily available.

Paragraph 21. To rebut the finding that respondent had not deposited family loans into the Metcalf State Bank accounts, respondent directs the court's attention to a check from his mother with a Metcalf State Bank stamp on the reverse. The check is dated August 27, 1996.

Paragraph 22. Respondent denies "the allegations."

Paragraph 23. Respondent asserts that he was authorized to sign Stuart's name on checks.

Paragraph 24. Respondent denies there was an unwritten agreement to share income and expenses equally with Stuart and Rogers. He cites the lack of any documentary evidence of an agreement.

Paragraph 25. Respondent denies that he asked Stuart to lie for him.

Paragraph 26. Respondent denies that he has not fulfilled the requirements to use the title CPA. He asserts that he received certification from the State of Missouri in 1991, but he did not obtain a license to practice as a CPA.

Paragraph 31. Respondent does not dispute that the paperwork to establish an LLC was not filed with the Secretary of State.

Following the filing of the final hearing report, respondent filed a motion to vacate the panel's report and to grant a new hearing before a different panel. The factual basis for respondent's motion is that Sally H. Harris, chairperson of the disciplinary panel that heard this matter, practices in a law firm with Paul Hasty, Jr., who prosecuted a monetary claim against respondent on behalf of a client. The following is a chronology of relevant dates:

| | |
|---|---|
| September 1998 | formal complaint filed against respondent |
| January 1999 | disciplinary hearing |
| April 30, 1999 | Hasty letter to respondent demanding payment |
| July 19, 1999 | Hearing panel decision |
| August 20, 1999 | Hasty letter to respondent demanding payment |
| November 9, 1999 | Harris informed by respondent's counsel of Hasty's prosecuting a claim against respondent |
| November 12, 1999 | Final Hearing Report, dated |
| November 19, 1999 | Final Hearing Report, filed |
| November 29, 1999 | Motion to Vacate the Panel of Judgment filed |

According to Hasty's affidavit, he had filed for his client a Chapter 61 claim against respondent sometime between his April 30 and August 20 letters. Hasty attests that he learned of the disciplinary action pending against respondent when "a former partner of or office sharer with" respondent called him after seeing notice of the lawsuit in the newspaper. He further attests that the telephone call was his only source of information about the disciplinary action until he first became aware in November from Sally Harris' inquiry that she was involved.

The legal basis for the motion is Supreme Court Rule 204(d): "Board members shall refrain from taking part in any proceeding in which a judge similarly situated would be required to abstain." (1999 Kan. Ct. R. Annot. 220.) Canon 3E(1) of the Code of Judicial Conduct provides that "[a] judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned." Supreme Court Rule 601A, Canon 3E(1) (1999 Kan. Ct. R. Annot. 471).

Respondent does not question Harris' statement that until she received counsel's letter on November 9, she was completely unaware of Hasty's pursuing a claim against respondent. In other

words, he concedes that the disciplinary proceeding was all but complete before Harris was advised that Hasty was prosecuting a claim against respondent. His point is that, despite Harris' innocence, there was an appearance of impropriety in her presiding over his disciplinary panel while another lawyer in her firm pursued, on behalf of a client, a claim against respondent.

Respondent wants the court to draw the conclusion that Hasty used this disciplinary action as leverage. Although this has nothing to do with Harris' conduct, the argument seems to be that if known to the public, Hasty's conduct might contribute to an appearance of impropriety. The "proof" that respondent offers of Hasty's use of the disciplinary proceedings as leverage lies in two documents attached to his motion: (1) Attachment 2—a letter from Hasty to respondent, and (2) Attachment 3—a discovery request filed by Hasty for documents from respondent. According to Hasty's affidavit, he was not aware of the pendency of this disciplinary proceeding when the letter was written. He had become aware before filing the discovery request. In a claim for conversion, however, a discovery request for a defendant attorney's disciplinary history seems more impertinent than improper. The question of other ethical violations might arise without knowledge of any pending claims.

Hasty described the claim he was prosecuting against respondent as "for conversion of monies belonging to Traders Insurance Company." In the letter dated April 30, 1999, Hasty further stated:

"It is my understanding that Traders issued a policy of automobile insurance to Mr. [Ronald] McQueen. A motor vehicle accident occurred and Mr. McQueen made a claim for PIP benefits. Mr. McQueen made a claim against the tortfeasor, who was insured by Farmers. With the assistance of Mr. Lucas, Mr. McQueen's claim was settled. Neither Mr. Lucas nor Mr. McQueen paid a lien to Traders."

On August 20, 1999, Hasty wrote to respondent:

"Mr. McQueen has indicated a willingness to pay half the claim if you will pay the other half. Please let me know if you will do that. I really do not want to get into discovery with regard to any ethical problems created by any intentional conversion or any past ethical problems that might show a malicious or evil intent so as to justify an award of punitive damages."

In an undated filing from the civil court department of Johnson County District Court, which is signed by Hasty as attorney for plaintiff Traders Insurance Company, the following discovery request is made: "All documents known to you to exist concerning any complaint made by any person against you concerning your handling of any legal matter at any time for the five (5) year period immediately preceding your response to the Request for Production."

The lesson respondent would have the court draw from the rule is that the appearance of impropriety requires recusal in the circumstances of this disciplinary proceeding. The only case law he cites is *State v. Logan*, 9 Kan. App. 2d 353, 678 P.2d 181, *aff'd as modified* 236 Kan. 79, 689 P.2d 778 (1984).

*Logan*, as a whole, does not help respondent's cause. Several years after Logan's conviction, a motion was filed in the district court seeking a new trial on several grounds, including that the trial judge was biased. An assigned judge refused to disqualify the trial judge from hearing the motion for new trial. The trial judge denied the motion. The Court of Appeals affirmed.

The trial took place in the Sedgwick County District Court. The judge was the father of an assistant prosecuting attorney in the office of the Sedgwick County district attorney. It was not alleged that the son had any part in the proceedings against Logan. 9 Kan. App. 2d at 354. The Court of Appeals concluded:

"The facts of this case show only that the trial judge's son was on the staff of the Sedgwick County district attorney's office as an assistant district attorney during the pendency of this action. The facts do not support any finding whatsoever that the defendant's right to a fair trial was impeded, infringed upon, or denied by the connection here disclosed. We find that defendant was not prejudiced in any way, and his sentence and conviction should not be set aside on this ground." 9 Kan. App. 2d at 355.

Nonetheless, the Court of Appeals suggested that in order "to eliminate this question being raised in future proceedings, "we would deem it appropriate for [the trial judge] to recuse himself from cases pending before him which the district attorney's office is prosecuting while his son is employed on its staff." 9 Kan. App. 2d at 355.

In reviewing the judgment of the Court of Appeals, this court framed the issue in this way: "Should the trial judge have recused himself pursuant to the Kansas Code of Judicial Conduct, Rule 601, Canon 3C(1) . . . ? In other words, did failure of the trial judge to step aside result in bias and prejudice to the defendant which was a denial of due process constituting reversible error?" *State v. Logan*, 236 Kan. at 86. The court formulated a two-part analysis for making the fair trial determination: "(1) Did the trial judge have a duty to recuse under the Code of Judicial Conduct? (2) If he did have a duty to recuse and failed to do so, was there a showing of actual bias or prejudice to warrant setting aside the judgment of the trial court?" 236 Kan. 79, Syl. ¶ 5. In answer to the first question, the court found no appearance of partiality because "[t]he judge's son was not even remotely involved in the preparation of this case" and would not be affected by the outcome. 236 Kan. at 88. The court, therefore, disapproved the Court of Appeals' suggestion that the trial judge recuse himself from criminal cases in the future. The court definitely agreed with the Court of Appeals in finding no bias or prejudice. Thus, there was no reversible error. 236 Kan. at 88-89.

Applying the *Logan* two-part analysis to the present case, we first encounter the question of whether a duty to recuse would exist during the time Harris was not aware of circumstances that might create an appearance of impropriety. It appears from the formulation of the analysis that the duty would be deemed to exist even if she were ignorant of the circumstances. However, even if an appearance of impropriety existed, the two-part analysis then would be reduced to the single question of whether there was a showing of actual bias or prejudice that would warrant setting aside the judgment.

Respondent, in his motion, asserts only that Harris and Hasty are in the same law firm and that there was coincidence in time of the disciplinary proceeding and the lawsuit against him. He makes no effort to show actual bias on the part of Harris or prejudice on his own part. His motion, therefore, must be denied.

The standard we apply on review of a disciplinary case was stated in *In re Blase*, 260 Kan. 351, 359, 920 P.2d 931 (1996):

" 'In *State v. Klassen*, 207 Kan. 414, 415, 485 P.2d 1295 (1971), we explained that we have a "duty in a disciplinary proceeding to examine the evidence and determine for ourselves the judgment to be entered.' " In *State v. Zeigler*, 217 Kan. 748, 755, 538 P.2d 643 (1975), this court stated that, although the report of the disciplinary board "is advisory only, it will be given the same dignity as a special verdict by a jury, or the findings of a trial court, and will be adopted where amply sustained by the evidence, or where it is not against the clear weight of the evidence, or where the evidence consisted of sharply conflicting testimony." See *In re Farmer*, 242 Kan. 296, 299, 747 P.2d 97 (1987).' " (Quoting *In re Carson*, 252 Kan. 399, 406, 845 P.2d 47 [1993].)

Here, the panel heard conflicting testimony and found Stuart's and Rogers' testimony to be credible. We do not agree with respondent that there is no evidence to support their testimony; however, more importantly, there is nothing in the record before us to discredit their testimony. For purposes of this appeal, we find the panel's report is "amply sustained by the evidence." Thus, we accept the panel's findings and conclusions and find there is clear and convincing evidence that respondent's conduct violated KRPC 8.4(c).

We agree with the panel's recommended discipline but do not feel, based upon the record, that reinstatement should be conditional on respondent's making restitution in an amount agreeable to Stuart and Rogers. We do concur that the amount and payment, if not agreed to by respondent and complainant, should be determined by an appropriate court of competent jurisdiction.

IT IS THEREFORE ORDERED that Christopher E. Lucas be suspended from the practice of law in the state of Kansas for a period of 2 years, effective as of the date of this opinion, in accordance with Supreme Court Rule 203(a)(2) (1999 Kan. Ct. R. Annot. 210).

IT IS FURTHER ORDERED that Christopher E. Lucas shall comply with Supreme Court Rule 218 (1999 Kan. Ct. R. Annot. 250) and continue to meet his CLE requirements and, at the end of the 2-year suspension, respondent will be reinstated upon furnishing proof of compliance thereof to the Clerk of the Appellate Courts.

IT IS FURTHER ORDERED that respondent pay the costs of this action and that this order be published in the official Kansas Reports.

ABBOTT, J., concurs in the result.