NOT DESIGNATED FOR PUBLICATION

Nos. 113,589
113,590

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

IN THE INTERESTS OF
A.L.H., d/o/b XX/XX/2007, a Male,
And
I.E.H. IV, d/o/b XX/XX/2004, a Male.

MEMORANDUM OPINION

Appeal from Washington District Court; WILLIAM B. ELLIOTT, judge. Opinion filed December 11, 2015. Affirmed.

*Meghan K. Voracek*, of Seneca, for appellant natural mother.

*Steve Kraushaar*, of Marysville, for appellant natural father.

*Richard E. James*, special prosecutor, for appellee, and *Kelly Navinsky-Wenzel*, as guardian ad litem.

Before GREEN, P.J., GARDNER, J., and JOHNSON, S.J.

*Per Curiam*: J.H. (hereinafter mother) and I.E.H. III (hereinafter father) appeal the termination of their parental rights over I.H. IV, born in 2004, and A.L.H., born in 2007. On appeal, parents argue that the trial court erred in four ways: (1) mother argues that the trial judge erred by failing to recuse himself upon her motion; (2) mother argues that the trial court erred by denying her motion to continue the termination hearing; (3) father argues that the trial court erred by failing to address parents' motions for the appointment of a permanent custodian; and (4) both parents argue that the trial court erred in terminating their parental rights. Nevertheless, all of parents' arguments on

1

appeal lack merit. As a result, we affirm the trial court's termination of parents' parental rights.

On March 4, 2014, the State petitioned the trial court to remove I.H. IV and A.L.H. from their parents' home. According to the State's petition, mother and father had recently been arrested on numerous drug charges, including distribution of marijuana and methamphetamine. Mother and father had been selling drugs from the family home. The petition further alleged that I.H.IV and A.L.H. were (1) without adequate parental care, control, or subsistence; (2) without care or control necessary for their mental or emotional health; (3) physically, mentally, or emotionally abused; and (4) at risk to sustain harm if not immediately removed from their parents' home.

A magistrate judge appointed a guardian ad litem (GAL) to represent I.H. IV and A.L.H. Then, the magistrate judge held a temporary custody hearing. Mother and father, who were out of jail on bond, appeared. The magistrate judge granted temporary custody to the State. Following this temporary custody hearing, the magistrate judge recused himself from the case due to a conflict of interest. Our Supreme Court then appointed Senior Judge William Elliott to preside over I.H. IV's and A.L.H.'s children in need of care (CINC) cases and parents' pending criminal cases.

Mother appealed the magistrate judge's order awarding temporary custody to the State. On March 28, 2014, the trial court held a temporary custody hearing de novo. The trial court ultimately found probable cause to believe the allegations within the State's petition and granted temporary custody to the State.

The trial court held an adjudication hearing on April 11, 2014. During this hearing, both mother and father submitted a signed statement of no contest to the State's petition that I.H. IV and A.L.H. were CINC. The trial court accepted both parents' no contest statements. Then, the trial court ordered that the children remain in State custody. The

2

trial court also adopted the proposed permanency plan from Saint Francis Community Services (SFCS), an organization that DCF contracted with to provide family services.

SFCS recommended a permanency plan goal of reintegration. To reach reintegration, SFCS implemented case plan goals and objectives for the parents to follow. Under the case plan, mother and father were supposed to: (1) stay sober, stable, and safe parents in their children's lives; (2) have no negative contact with law enforcement; (3) maintain a clean and orderly home so the children could visit and later reintegrate; (4) maintain employment and provide verification of that employment; (5) complete a mental health intake and follow all recommendations concerning healthy communication skills with each other, drug and alcohol concerns, and I.H. IV's anxiety; (6) submit to a drug and alcohol evaluation; (7) keep SFCS updated about pending criminal cases; and (8) complete all parenting classes. Additionally, in SFCS's case plan notes, SFCS reported that parents were scrapping and cleaning houses for income and that parents had bought a new house.

Before the next review hearing, on July 29, 2014, the police obtained a search warrant to search for drugs in parents' new house. During the search of parents' house, police found marijuana, methamphetamine, and drug paraphernalia. As a result of this search, mother and father were arrested. It seems mother and father were unable to bond out of jail after this arrest.

In August 2014, mother was convicted of one count of possession with intent to distribute marijuana. In September 2014, mother was additionally convicted of one count of felony possession of drug paraphernalia with intent to manufacture or grow. For both counts, mother received a total sentence of 32 months' imprisonment. In September 2014, father was convicted of one count of possession with intent to distribute marijuana, one count of possession with intent to distribute methamphetamine, and two counts of

possession of methamphetamine. For all four counts, father received a total sentence of 101 months' imprisonment.

In October 2014, both parents moved to appoint a permanent custodian. Because of their imprisonment, parents requested that the trial court appoint D.L.W., I.H. IV and A.L.H.'s maternal grandmother, as the children's permanent custodian. It seems the trial court never addressed this motion.

On November 3, 2014, the trial court held a review hearing. At this hearing, the trial court found that reintegration of I.H. IV and A.L.H. may not be a viable option given that mother and father were incarcerated. Another review hearing was held on December 9, 2014. At this hearing, SFCS submitted a report that updated the trial court on parents' progress. SFCS noted that parents had failed to comply with several of their case plan goals. SFCS further recommended that the trial court find that reintegration of I.H. IV and A.L.H. with parents was no longer a viable goal. The trial court found that parents' progress was inadequate and that reintegration was no longer a viable goal. Following this order, the State moved to terminate parents' parental rights because both were unfit by reason of conduct or condition and both were unlikely to change in the foreseeable future. The trial court scheduled the termination hearing for January 23, 2015.

Before the termination hearing, mother filed three motions. First, on January 16, 2015, mother moved for a continuance because she wanted SFCS to investigate whether I.H. IV and A.L.H. could be placed in the custody of their paternal aunt, T.M, who lived in Colorado. Mother wanted SFCS to pursue an Interstate Compact on the Placement of Children (ICPC) with T.M., but alleged that SFCS was not making efforts to complete an ICPC. Next, on January 19, 2015, mother moved to disqualify the trial judge as the presiding judge. Mother alleged that the trial judge was biased against her because he also presided over her criminal cases. The trial court issued an order denying both motions. Following the denial of this motion, on January 21, 2015, mother filed a pro se

4

motion for new attorney in which she alleged that her attorney did not comply with some of her requests.

At the termination of parental rights hearing on January 23, 2015, the trial judge opened by stating that there was no reason for him to recuse himself because he had no bias or prejudice against mother. The trial judge then noted that the reason he was assigned to I.H. IV's and A.L.H.'s CINC cases and to parents' criminal cases was because the other judges in the judicial district had conflicts of interest.

Next, the trial court addressed mother's pro se motion for new attorney. The trial court denied this motion because he believed mother was attempting to delay the termination hearing by any means possible given the timing of her continuance motion, recusal motion, and now new attorney motion. The trial court stated that mother's motion was "not in good faith" or in the best interest of the children. After the denial of her new attorney motion, mother decided to continue with her current attorney instead of proceeding pro se.

Following this exchange, the termination hearing proceeded. The State, I.H. IV and A.L.H.'s GAL, mother and mother's attorney, and father and father's attorney all appeared at the termination hearing. The State presented testimony from the following: Brandi Lewis, the assigned DCF social worker in this case; Undersheriff Kyle Applegarth, who investigated parents' criminal cases; Shane Stadtler, the counselor who worked with mother and father; Carly Bloomfield, the a counselor who worked with I.H. IV and A.L.H; Tom Anderson, the family support worker with SFCS who monitored visits between mother, father, I.H. IV, and A.L.H.; and Rascheal Nutsch, the assigned SFCS social worker and case manager in this case.

Lewis testified about DCF's contact with the family since 2004. According to Lewis, in 2004, DCF was notified when mother left D.L., mother's eldest child with a

5

different father, unattended. In 2005, DCF received a phone call from mother's probation officer who was concerned that mother was not correctly using skills that she learned at parenting classes. In 2006, DCF was contacted over concerns that D.L. was neglected after he received second-degree burns from a mishap in a kitchen. In 2007, DCF was contacted after D.L. broke car windows. In 2011, DCF was contacted after D.L. threatened to bring a gun to school and shoot his peers. In January 2014, DCF was contacted after there were allegations parents physically abused A.L.H. The last time DCF was contacted was when parents were arrested in February 2014.

Lewis explained that all but one of these incidents were unsubstantiated. Lewis also testified about two incidences DCF learned about while investigating the family. First, Lewis testified that during an interview, D.L., I.H. IV, and A.L.H. told a social worker that father pointed a gun at mother's head. The children were afraid and called the police, but when police arrived, the children denied anything had happened. Lewis explained that even though mother admitted that father pointed a "pellet gun" at her head, this account was unsubstantiated because DCF never "observed the alleged gun." Second, Lewis testified that A.L.H. had told her that his father asked him to touch his mother's vagina. According to Lewis, A.L.H. stated that he told his father "no," and his father responded by laughing.

Undersheriff Applegarth testified about obtaining and executing the search warrants on parents' house in February 2014 and parents' new house in July 2014. Applegarth explained that during both searches, the police found and seized marijuana, methamphetamine, and several items of drug paraphernalia. Applegarth also explained that during both searches, the drugs and drug paraphernalia were located in parents' bedroom, which was accessible to the children.

Stadtler testified that he had conducted only a few counseling sessions before mother and father stopped attending. Stadtler testified that mother and father told him

6

they wanted a new counselor. Stadtler explained that neither mother nor father were interested in programs he suggested like narcotics anonymous and were very argumentative.

Bloomfield testified that based on her interactions with I.H. IV and A.L.H during counseling, the children were abnormally aggressive. Bloomfield testified that based on reports from DCF and statements made by the children in counseling, she believed this abnormal aggression stemmed from the children witnessing "numerous accounts of domestic violence." Bloomfield explained that all three children expressed concerns about father getting mad and beating mother up. Bloomfield testified that "[a]ll three [have] expressed . . . that they thought somebody was going to die." Bloomfield further testified that all three children told her that they have been whipped with a belt as punishment.

Regarding sexual abuse, Bloomfield stated that A.L.H. told her he has watched his parents having sex. A.L.H also told Bloomfield about his father asking him to touch his mother's vagina. Bloomfield testified that I.H. IV told her that he had seen his mother engaging in sexual acts with men who were not his father. Bloomfield believed that I.H. IV and A.L.H were sexually advanced for their ages because they have been exposed to inappropriate sexual behavior.

Bloomfield also testified that she believed I.H. IV and A.L.H. had made progress since being removed from their parents' custody. According to Bloomfield, both I.H. IV and A.L.H. had improved in school. Bloomfield explained that I.H. IV and A.L.H. were aware that parents were selling drugs from the family home. Bloomfield testified that I.H. IV told her that he was relieved that his parents were arrested because he no longer had to worry about them getting arrested all the time and because his father could no longer hurt his mother. Bloomfield also testified that the children were significantly less aggressive.

7

Anderson testified that while monitoring visitations between the parents, I.H. IV, and A.L.H., he witnessed very aggressive behaviors. Anderson testified that parents allowed the children to play very violent video games. Moreover, when A.L.H. was kicking farm animals, father took no actions to stop A.L.H.

Nutsch testified that father had uploaded concerning videos to YouTube. In one video, father blew out a motorcycle tire by rigging the motorcycle to a tree and spinning its tires. Nutsch testified that in the video, A.L.H. was walking around the back of the motorcycle as its wheels spun. In another video, Nutsch explained that father "tased" a man by rigging a Taser to an office chair, while I.H. IV and A.L.H. laughed. Nutsch testified that when she asked I.H. IV about this video, I.H. IV told her that father had "tased" him in the chair before too.

Concerning parents' case plan, Nutsch testified that out of the 8 case plan goals SFCS implemented, parents only complied with keeping SFCS informed about their pending criminal cases. In explaining how parents failed to comply with the other case plan tasks, Nutsch revealed that father had been cheating on his drug urinalysis tests by placing mother's clean urine in a penis prosthetic. Nutsch further testified that mother admitted to supplying father with clean urine. When asked if she believed parents ever adjusted their circumstances to reach the goal of reintegration, Nutsch responded, "I think they adjusted their circumstances so we couldn't catch them working around the system."

Nutsch then testified that SFCS recommended termination. Nutsch provided the trial court with details of parents' felony convictions and the length of parents' prison sentences as additional support for the recommendation. Nutsch explained that the agency took reasonable efforts to reintegrate the children with parents, but parents failed to comply with their case plan goals for reintegration. Furthermore, Nutsch testified that I.H. IV and A.L.H. have improved greatly since being removed from their parents.

After Nutsch's testimony, the State rested. I.H. IV and A.L.H.'s GAL and father did not present any evidence. Then, Mother testified on her own behalf. Mother testified that SFCS was not making all possible efforts to reintegrate her children. Mother stated that she repeatedly called SFCS, but they ignored her phone calls. Mother stated that she was meeting her case plan goals. Mother stated that the reason she did not complete counseling with Stadtler was because Stadtler was telling DCF and SFCS things she had said in counseling without her permission. Mother also testified that she was working very hard to turn her life around and had entered several counseling and education programs while in prison.

The trial court ultimately found that there was clear and convincing evidence that mother and father were unfit by reason of conduct or condition which rendered both unable to care for I.H. IV and A.L.H. and this conduct or condition was unlikely to change in the foreseeable future. Additionally, the trial court found that termination of parents' parental rights was in the best interest of I.H. IV and A.L.H. Accordingly, the trial court terminated parents' parental rights.

Both mother and father timely appealed.

*Should the Trial Judge Have Recused Himself?*

On appeal, mother asserts that the trial judge had a personal bias against her because the trial judge presided over parents' criminal cases in addition to presiding over I.H. IV's and A.L.H.'s CINC cases. Mother contends that the trial judge could not have been impartial during the termination hearing because he knew facts about her criminal case. As proof of the trial judge's bias, mother points out that the trial judge referenced her criminal cases while denying her motion for a new attorney. Nevertheless, mother's assertions are unfounded.

9

*Standard of Review and Applicable Law*

Under Kansas law, there are three ways for litigants to seek recusal of a trial judge: the Kansas Code of Judicial Conduct, the recusal statute K.S.A. 20-311d(c), and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. See *State v. Hurd*, 298 Kan. 555, 568, 316 P.3d 696 (2013). In this case, mother relies on the Kansas Code of Judicial Conduct, Supreme Court Rule 601B, Canon 2, Rule 2.11 (2015 Kan. Ct. R. Annot. 761), which states:

> "(A) A judge shall disqualify himself or herself in any proceeding in which the judge's *impartiality* might reasonably be questioned, including but not limited to the following circumstances:
> "(1) The judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal *knowledge* of facts that are in dispute in the proceeding."

Appellate courts have unlimited review over allegations of judicial misconduct. *State v. Kemble*, 291 Kan. 109, 113, 238 P.3d 251 (2010). To successfully argue that a judge should have disqualified himself or herself on appeal, an appellant must show: (1) the judge had a duty to recuse himself under the Kansas Code of Judicial Conduct, and (2) the judge's actual bias or prejudice warrants reversal. See *In re Lucas*, 269 Kan. 785, 794, 7 P.3d 1186, 1192 (2000) (citing *State v. Logan,* 236 Kan. 79, 86, 689 P.2d 778 [1984]); see also *State v. Schaeffer*, 295 Kan. 872, 876, 286 P.3d 889 (2012). An appellate court should find that "[d]isqualification of a judge is appropriate when the circumstances and facts of the case 'create reasonable doubt concerning the judge's impartiality, not in the mind of the judge himself, or even, necessarily, in the mind of the litigant filing the motion, but rather in the mind of a reasonable person with knowledge of all the circumstances.'" *Schaeffer*, 295 Kan. at 875, (quoting *Logan,* 236 Kan. at 86).

*Did Mother Prove That Trial Judge was Biased?*

Although mother asserts that the trial judge was not impartial because he presided over parents' criminal cases, the record on appeal does not support this assertion. In her brief, mother first argues "that because the judge knew of the details of the criminal cases and sentences [the judge held] a certain bias against [her and father] and would not be impartial in the termination their parental rights." By making this argument, mother essentially asserts that any trial judge who presides over a parent's criminal case cannot preside over parent's termination of parental rights hearing because the trial judge will always be biased against parent. Yet, our Supreme Court evidently disagrees with this assertion. Again, our Supreme Court assigned Senior Judge Elliott to preside over I.H. IV's and A.L.H.'s CINC cases and parents' respective criminal cases.

Mother also fails to recognize that any judge who presided over I.H. IV's and A.L.H.'s CINC cases would have learned about parents' criminal cases. As previously detailed, the facts of parents' criminal cases were intertwined with the children's CINC cases. Children were removed from their parents' custody after police discovered that parents were selling drugs from the family home. SFCS requested that the trial court make a finding that reintegration was no longer a viable option after parents were convicted and sentenced to prison. Moreover, Undersheriff Applegarth and Nutsch testified about parents' criminal cases at the termination of parental rights hearing. Thus, even if a different trial judge had presided over the parents' criminal cases, the trial judge that presided over the children's CINC cases would have learned a great deal about parents' criminal cases.

Moreover, the only evidence mother cites to support her contention is that the trial judge mentioned her criminal cases while denying her motion for new attorney. A review of the trial judge's statements concerning mother's criminal cases, however, clearly shows

11

that the trial judge was attempting to explain why he did not believe mother's motion for new attorney was made in good faith.

In denying the motion, the trial judge referenced mother's criminal case three times. First, the trial judge stated that mother had already had two attorneys in her children's CINC cases and had gone through multiple attorneys in her criminal cases. Second, the trial judge noted that mother had caused several delays in both her children's CINC cases and her criminal cases. Third, after mother complained about her attorney by stating that she believed things "could've been different" had her attorney taken different actions, the trial judge told mother that it was her criminal offenses in February 2014 and July 2014, not her attorney actions or inactions, that led to the termination hearing.

By taking these statements in context, it is clear that the trial judge was explaining why he believed mother's motion for new attorney was not in good faith. Again, mother moved for a new attorney after the trial judge denied her motions for continuance and recusal. Furthermore, mother moved for a new attorney just 2-days before the termination hearing. The circumstances surrounding mother's request made the trial judge suspicious that mother was attempting to delay the termination hearing by any means possible. As a result, the trial judge brought up past examples of how mother had attempted to delay proceedings, including new attorney requests and continuance delays in her criminal cases. Regarding the trial judge's statement that it was mother's criminal offenses that led to the State's motion to terminate parental rights, the trial judge clearly brought this up because mother was shifting blame onto her attorney for the pending termination of her parental rights.

Consequently, if one looks at the context of the trial judge's references to mother's criminal cases, it is readily apparent that he referenced mother's criminal cases only to support the denial of her new attorney motion. Certainly these facts alone do not create reasonable doubt as to Judge Elliott's impartiality. Overall, mother has failed to provide

12

this court with any persuasive arguments why the trial judge had a duty to recuse himself under Kansas Code of Judicial Conduct. As a result, mother's recusal motion fails.

*Did Trial Court Err When It Denied Mother's Motion for Continuance?*

Next, mother argues that the trial court erred by denying her continuance motion. Again, in mother's continuance motion, mother alleged that she needed a continuance because SFCS was not investigating T.M. as a viable placement option as she had requested. In her brief, mother argues that the trial court should have granted her continuance motion because if T.M. was a viable placement option for I.H. IV and A.L.H., then "the termination proceeding would have been unnecessary." Yet, mother's argument is unpersuasive.

*Standard of Review*

An appellate court reviews the trial court's refusal to grant a continuance for an abuse of discretion. *In re J.A.H.*, 285 Kan. 375, 385, 172 P.3d 1 (2007). "Typically, 'discretion is abused only when no reasonable person would take the view adopted by the district court.'" *In re J.A.H.*, 285 Kan. at 385 (quoting *Vorhees v. Baltazar,* 283 Kan. 389, 393, 153 P.3d 1227 [2007]).

*Applicable Law*

K.S.A. 2014 Supp. 38-2246 states that proceedings under the Revised Kansas Code for Care of Children must be disposed of without delay. The trial court shall not grant a continuance unless there is good cause shown. K.S.A. 2014 Supp. 38-2246. When the trial court rules on a motion for continuance, it "'must consider all circumstances, particularly such matters as the applicant's good faith, his showing of diligence, and the timetable of the lawsuit.'" *In re J.A.H.*, 285 Kan. at 385 (quoting *Fouts v. Armstrong*

13

*Commercial Distributing Co.,* 209 Kan. 59, 65, 495 P.2d 1390 [1972]). Furthermore, once the trial court has received a motion requesting termination of parental rights, the trial court shall grant a continuance "only if the court finds it is in the best interests of the child." K.S.A. 2014 Supp. 38-2267. When the trial court decides CINC cases, the trial court must strive to decide these cases in "'child time' rather than 'adult time.'" *In re J.A.H.*, 285 Kan. at 386 (citing *In re D.T.,* 30 Kan.App.2d 1172, 1175, 56 P.3d 840 [2002]).

*Did Trial Court Abuse Its Discretion When It Denied Mother's Motion for Continuance?*

In this case, the trial court did not abuse its discretion by denying mother's motion for continuance because mother's continuance motion (1) was not made in good faith, (2) was not made diligently, (3) was not in the best interest of her children, and (4) was not relevant to the termination of her parental rights.

First, given that mother made three motions right before the termination hearing was scheduled, it is readily apparent that mother was not moving for a continuance in good faith. Any of these three motions would have delayed the termination hearing if granted. At the termination hearing, the trial judge cited to these three motions in explaining that he believed mother was attempting to delay the termination hearing.

Second, it is evident from the record on appeal that mother was not diligent in attempting to obtain a continuance. In the trial court's order denying the motion, the trial court noted that the January 23, 2015, termination hearing date had been scheduled since December 9, 2014, but mother did not move for a continuance until January 16, 2015. The trial court further noted that all parties agreed to the January 23, 2015, date without objection.

14

Third, there was strong evidence that a continuance was not in the best interest of I.H. IV and A.L.H. At the time of the termination hearing, the children had been in State custody for almost a year. In denying mother's continuance motion, the trial judge stated that he was denying mother's motion in part because finding permanency for the children was essential. At the termination hearing, the trial judge also stated that he would not delay the termination hearing because that was not in the best interest of the children.

Fourth, whether mother's parental rights were terminated had no impact on whether I.H. IV and A.L.H. were ultimately placed with T.M. Under K.S.A. 2014 Supp. 38-2269(g)(2), after the trial court terminates a parent's parental rights, the court may authorize adoption or appoint a permanent custodian. K.S.A. 2014 Supp. 38-2264(h) requires that the trial court continue to have permanency hearings until the child has been adopted or appointed a permanent custodian. Thus, the termination of mother's parental rights did not and does not mean that T.M. could not become I.H. IV and A.L.H.'s permanent custodian. In fact, a report from SFCS to the trial court following the termination of parents' parental rights indicates that the agency was investigating T.M. as a potential permanent custodian for children.

For the foregoing reasons, the trial court did not abuse its discretion in denying mother's motion.

*Did Trial Court Err in Failing to Appoint a Permanent Custodian Before Termination of Parents' Parental Rights?*

In October 2014, both parents moved to appoint D.L.W. as I.H. IV and A.L.H.'s permanent custodian. The trial court never ruled on this motion. Father now argues that the trial court erred by failing to appoint D.L.W. as children's permanent custodian before it terminated his parental rights. Regardless, neither parent complied with the applicable

statutes allowing parents to consent to the appointment of a permanent custodian; thus, the trial court did not err by failing to appoint D.L.W. as children's permanent custodian.

*Standard of Review*

Whether the trial court erred by failing to appoint a permanent custodian before the termination of parents' parental rights requires this court to interpret the Revised Kansas Code for Care of Children, K.S.A. 2014 Supp. 38-2201, *et. seq.* Interpretation of a statute is a question of law, subject to unlimited review. *In re C.C.*, 29 Kan. App. 2d 950, 955, 34 P.3d 462 (2001).

*Did Trial Court Correctly Disregard Father's Motion to Appoint D.L.W. as Permanent Custodian of I.H. IV and A.H.L.?*

On appeal, father cites to three statutory provisions to support his argument: K.S.A. 2014 Supp. 38-2266(a), K.S.A. 2014 Supp. 38-2268(a), and K.S.A. 2014 Supp. 38-2268(c)(1). A review of these statutes, however, proves that parents failed to comply with the statutes when requesting that D.L.W. be appointed as children's permanent guardian.

Regarding K.S.A. 2014 Supp. 38-2266(a) and K.S.A. 2014 Supp. 38-2268(a), both statutes require that parents abandon their rights over their child before they can request the appointment of a permanent custodian. K.S.A. 2014 Supp. 38-2266(a) states:

> "Either in the original petition filed under this code or in a motion made in an existing proceeding under this code, any party or interested party may request that either or both parents be found unfit and the parental rights of either or both parents be terminated or a permanent custodian be appointed."

16

Thus, under K.S.A. 2014 Supp. 38-2266(a), if parents want a permanent custodian appointed, parents must first request that the trial court find them unfit. K.S.A. 2014 Supp. 38-2268(a) states that before a termination of parental rights hearing, "if the child's permanency plan is either adoption or appointment of a custodian, with the consent of the guardian ad litem and the secretary, either or both parents may relinquish parental rights to the child, consent to an adoption or consent to appointment of a permanent custodian." Thus, under K.S.A. 2014 Supp. 38-2268(a), if parents want a permanent custodian appointed, parents must first relinquish their rights to their child.

Yet, in parents' motions to appoint D.L.W. as a permanent custodian, neither parent requested that they be found unfit as required under K.S.A. 2014 Supp. 38-2266(a) and neither parent requested that their rights be relinquished as required under K.S.A. 2014 Supp. 38-2268(a). The fact that parents currently appeal the termination of their parental rights is further support that neither parent wanted to give up their parental rights in requesting that D.L.W. be appointed as permanent guardian.

In *In re C.C.*, 29 Kan. App. 2d 950, this court rejected an identical argument. In *In re C.C.*, parents argued that the trial court erred when it did not rule on their motion to appoint a grandmother as a permanent guardian. Parents cited as authority K.S.A. 1999 Supp. 38-1581(a), which has since been recodified without any substantive changes to K.S.A. 2014 Supp. 38-2266(a). Although parents asked for the appointment of a permanent guardian, the parents contested that they were unfit. In ruling against parents, this court interpreted K.S.A. 1999 Supp. 38-1581(a), holding that it was "difficult to read [the] statute without concluding the movant must first request a parental unfitness finding and then request one of two alternative dispositions: termination or permanent guardianship." *In re C.C.*, 29 Kan. App. 2d at 956. This court further held that parents' motion was statutorily deficient because it was "incongruous for the parents to profess their fitness, yet complain they were denied their right to use the procedures set forth in [the statute]." *In re C.C.*, 29 Kan. App. 2d at 956.

17

As in *In re C.C.*, we find that the trial court did not err by disregarding both parents' motions to appoint D.L.W. as a permanent guardian. If parents wanted to appoint a permanent guardian via K.S.A. 2014 Supp. 38-2266(a), then parents should have agreed to a finding of a parental unfitness. If parents wanted to appoint a permanent guardian via K.S.A. 2014 Supp. 38-2268(a), then parents should have agreed to relinquish their parental rights. Because parents failed to follow these procedures, parents' motions were statutorily deficient; thus, the trial court correctly disregarded parents' motions.

Finally, father also cites K.S.A. 2014 Supp. 38-2268(c)(1) to support his argument that the trial court erred by failing to appoint D.L.W. as I.H. IV and A.L.H.'s permanent custodian. K.S.A. 2014 Supp. 38-2268(c)(1) states that "[a] parent may consent to appointment of an individual as permanent custodian and if the individual accepts the consent, such individual shall stand in loco parentis to the child and shall have and possess over the child all the rights of a legal guardian." Thus, K.S.A. 2014 Supp. 38-2268(c)(1) is different from K.S.A. 2014 Supp. 38-2266(a) and K.S.A. 2014 Supp. 38-2268(a), because parent's ties with a child are not completely severed when there is a consensual appointment of a permanent guardian. See *State ex rel. Secretary of SRS v. Bohrer*, 286 Kan. 898, 915, 189 P.3d 1157 (2008). Nevertheless, to successfully appoint a permanent guardian under K.S.A.2014 Supp. 38-2268(c)(1), the would-be permanent custodian must consent to the appointment.

Here, however, the record on appeal reveals that D.L.W. did not want to be children's permanent custodian. According to SFCS's December 2014 report to the court, after parents moved to have D.L.W. appointed as permanent guardian, SFCS contacted D.L.W. and reported that she expressed doubt as to whether she could meet the children's supervision and structure needs. SFCS reported that D.L.W. stated that "[s]he would be willing to act as a support for the boys if they are placed with another relative." SFCS also reported that even if D.L.W. wanted the children, it might be unworkable to place the children with D.L.W. because D.L.W. has a criminal history record and a

18

communicable disease. In essence, the trial court could not have erred given that the record indicates that D.L.W. never consented to becoming children's permanent guardian. At the very least, if the trial court erred by failing to address parents' motions, this error was harmless because D.L.W. did not want to become children's permanent guardian. See *In re J.D.C.*, 35 Kan. App. 2d 908, 915, 136 P.3d 950 (2006) *aff'd*, 284 Kan. 155, 159 P.3d 974 (2007), where this court applied harmless error analysis in a CINC case.

As a result, although father cites to K.S.A. 2014 Supp. 38-2266(a), K.S.A. 2014 Supp. 38-2268(a), and K.S.A.2014 Supp. 38-2268(c)(1) to support his argument, he has failed to prove the trial court erred by failing to address his and mother's motions to appoint D.L.W. as children's permanent custodian. Accordingly, his argument fails.

*Did Trial Court Err by Terminating Parents' Parental Rights?*

Lastly, parents argue that the trial court erred by terminating their parental rights. As detailed below, clear and convincing evidence supports the trial court's findings that parents were unfit, that parents were unlikely to change in the foreseeable future, and that the termination of parents' parental rights was in the best interest of I.H. IV and A.L.H. Moreover, neither parent persuasively argue that the trial court erred in making its decision.

*Standard of Review*

In reviewing the trial court's termination of parental rights, an appellate court must "consider whether, after review of all the evidence, viewed in the light most favorable to the State, it is convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence." *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). In making this determination, an appellate court does not weigh conflicting

19

evidence, pass on the credibility of witnesses, or re-determine questions of fact. *In re B.D.-Y.*, 286 Kan. at 705.

*Applicable Law*

Before the trial court can terminate a parent's parental rights, the trial court must find that the moving party has proven the following by clear and convincing evidence: (1) the parent is unfit "by reason of conduct or condition which renders the parent unable to care properly for a child"; (2) the conduct or condition that renders parent unfit "is unlikely to change in the foreseeable future"; and (3) termination of parent's parental rights is in the best interest of the child. K.S.A. 2014 Supp. 38-2269(a), (g)(1). Under K.S.A. 2014 Supp. 38-2269(b) and (c), the trial court must consider a nonexclusive list of factors while determining whether a parent is unfit. "The existence of any one of [these] factors standing alone may, but does not necessarily, establish grounds of termination of parental rights." K.S.A. 2014 Supp. 38-2269(f).

*Was There Clear and Convincing Evidence to Support Trial Court's Findings?*

When the trial court terminated parents' parental rights, the trial court found that there was clear and convincing evidence that parents were unfit by reason of conduct or condition which rendered parents unable to care for I.H. IV and A.L.H. and that this conduct or condition was unlikely to change in the foreseeable future based on the following: (1) both parents were arrested in late February 2014 and July 2014, charged with multiple crimes, convicted of felonies, and sentenced to prison until 2016 and 2021, respectively; (2) drugs were found in areas of the home I.H. IV and A.L.H. had access to; (3) I.H. IV and A.L.H. were doing well, feeling safe, and less aggressive since entering State custody; (4) parents' case plan required counseling and both parents were uncooperative; (5) social agencies made reasonable efforts to reintegrate I.H. IV and A.L.H. with parents but parents failed to comply with reasonable case plan to support

20

reintegration; (6) parents did not make efforts to adjust their circumstances and/or conduct to meet the needs of I.H. IV and A.L.H.; (7) parents subjected I.H. IV and A.L.H. to sexual abuse, emotional abuse, and domestic violence; (8) parents failed to care for I.H. IV and A.L.H.; (9) parents' use of illegal narcotics was for such a duration to prevent them from caring for I.H. IV and A.L.H.; and (10) family had contact with DCF since 2004.

After making this finding, the trial court further found that there was clear and convincing evidence that termination of parents' parental rights would be in the best interests of I.H. IV's and A.L.H.'s physical, mental, and emotional health. Thus, the trial court terminated parents' parental rights.

On appeal, mother and father attempt to undermine the trial court's order terminating their parental rights by attacking the factual findings made by the trial court in support of termination. Nevertheless, a review of the evidence supporting each of the trial court's findings and a review of parents' arguments concerning these findings definitively proves that clear and convincing evidence supports the termination of parents' parental rights.

*Did Testimony From Termination of Parental Rights Hearing Support Trial Court's Underlying Factual Findings?*

Testimony from the termination hearing supports each of the factual findings the trial court relied on in terminating parents' parental rights.

First, it is an undisputed fact that parents were arrested and charged with felonies in late February 2014, rearrested and again charged with new felonies in July 2014, and then convicted of these felonies and sentenced to prison in August and September 2014.

Both Undersheriff Applegarth and Nutsch testified about parents' convictions and sentences.

Second, Undersheriff Applegarth testified that the drugs parents were selling from their home could be accessed by children. At the termination hearing, neither parent presented evidence that the drugs were inaccessible by children.

Third, at the termination hearing, the State presented evidence that I.H. IV and A.L.H. were doing better, feeling safe, and less aggressive since being removed from parents. Again, Bloomfield testified that both I.H. IV and A.L.H had improved in school, that I.H. IV was relieved parents were arrested, and that I.H. IV and A.L.H. were significantly less aggressive. Nutsch also testified that I.H. IV and A.L.H. had improved greatly.

Fourth, Stadtler testified that parents were uncooperative in the case plan assigned counseling. Stadtler testified that parents did not come to some counseling sessions and were argumentative in the sessions they attended.

Fifth, the State presented evidence that SFCS made reasonable efforts to reintegrate I.H. IV and A.L.H. with parents but parents did not comply with the case plan goals that were put in place. Nutsch testified that SFCS offered parents classes, counseling, and services so parents could reach their case plan goals. Yet, parents complied with only one case plan goal—keeping SFCS informed about their pending criminal cases. Moreover, Nutsch testified that SFCS had taken reasonable steps to reintegrate parents with children but parents did not make reasonable efforts to obtain reintegration.

Sixth, the State presented evidence that parents did not make efforts to adjust their circumstances or conduct to meet the needs of I.H. IV and A.L.H. Again, Undersheriff

Applegarth testified about parents being rearrested on new drug distribution charges in July 2014. Nutsch testified about parents failing to comply with SFCS case plan goals even though SFCS provided parents with support to meet those goals.

Seventh, the State presented evidence that I.H. IV and A.L.H had been subjected to sexual abuse, emotional abuse, and domestic violence. Bloomfield stated that the children spoke to her about father beating mother. Regarding sexual abuse and inappropriate sexual activity, Bloomfield and Lewis testified that A.L.H. told them that father had asked him to touch mother's vagina while laughing at him. Moreover, evidence was presented concerning I.H. IV and A.L.H. witnessing parents engaging in sexual acts. Regarding emotional abuse and domestic violence, the State presented evidence that father beat up mother in front of children, that father pointed a gun at mother's head in front of children, that father whipped children with belts, that father tased I.H. IV as a practical joke. Eighth, the preceding evidence of emotional abuse, sexual abuse, and domestic violence also support the trial court's finding that parents failed to properly care for I.H. IV and A.L.H.

Ninth, parents' felony convictions and prison sentences support that parents' use of illegal drugs has been for such a duration to prevent them from caring for I.H. IV and A.L.H. Due to father's drug crime convictions and prison sentence, father will be in prison until February 2021. Due to mother's drug crime convictions and prison sentence, mother will be in prison until July 2016. Thus, both parents' use of illegal drugs has taken them away from their children for several years. Also, Nutsch testified about father using mother's clean urine inside a penis prosthetic to pass his urinalysis drug tests. This indicates that parents' use of drugs has negatively impacted parents' ability to care for I.H. IV and A.L.H. because father clearly continued to use drugs while children were in State custody and mother supported father's drug use by supplying him clean urine.

Tenth, Lewis testified about the parents' contact with DCF starting in 2004. Lewis testified that DCF was contacted to investigate the family in 2004, 2006, 2007, 2011, January 2014, and February 2014. Lewis also provided the trial court with details about each contact DCF had with the family.

In sum, there was testimony presented during the termination of parental rights hearing to support each factual finding made by the trial court.

*Are Mother's Arguments Meritless?*

On appeal, mother challenges several of the factual findings the trial court made in support of terminating her parental rights. Yet, as detailed below, all of mother's arguments are meritless.

First, mother argues that the trial court erred by finding that (1) she was uncooperative at counseling, (2) she did not make efforts to adjust her circumstances to meet her children's needs, and (3) social agencies made reasonable efforts to reintegrate I.H. IV and A.L.H. with parents. To support her argument, mother points to her testimony at the termination hearing. Again, at the termination hearing, mother testified that she cooperated with her case plan goal of counseling. Mother testified that she was adjusting her circumstances by taking advantage of prison counseling and education programs. Moreover, mother testified that she was unhappy with SFCS because she believed they were not taking certain steps to help her reintegrate with her children.

As previously detailed, however, Stadtler testified that mother was uncooperative in counseling, Nutsch explained how mother had not adjusted her circumstances by failing to comply with case plan goals, and Nutsch also testified that SFCS had made reasonable efforts to reintegrate mother and children. Thus, the trial court obviously made a credibility determination that Stadtler and Nutsch were more trustworthy than mother.

24

Because this court cannot reweigh evidence or substitute its judgment for the judgment of the trial court, mother cannot successfully argue that the trial court lacked clear and convincing evidence to rely on these factors in terminating her rights. See *In re B.D.-Y.*, 286 Kan. at 705.

Next, mother takes issue with the trial court's finding that (1) parents subjected I.H. IV and A.L.H. to sexual abuse, emotional abuse, and domestic violence and (2) parents' use of drugs had been for such a duration to prevent them from caring for I.H. IV and A.L.H. Mother asserts that these factors were insufficient reasons to find her unfit. Nevertheless, in making these arguments mother ignores the plain language of K.S.A. 2014 Supp. 38-2269(b)(2) and (3). Under K.S.A. 2014 Supp. 38-2269(b)(2) and (3), the trial court must consider certain factors in determining whether a parent is unfit. These factors include whether parents physically, emotionally, or sexually abused their children and whether parents used dangerous drugs for such a duration that parents cannot adequately care for children. K.S.A. 2014 Supp. 38-2269(b)(2) and (3). Furthermore, under K.S.A. 2014 Supp. 38-2269(f), either of these factors alone could be sufficient to establish grounds for terminating of mother's rights. Therefore, mother's argument is wrong because in making a finding of parental unfitness, the trial court must consider the factors she argues against and may terminate a parent's parental rights based on either factor alone.

It is also worth noting that in making this argument, mother seems to ignore that the abuse and violence her children were exposed to and her use of illegal drugs were just two factors of many factors that the trial court relied on in making its finding of unfitness. Even if the trial court did not consider these factors in making its finding that mother was unfit, there would still be clear and convincing evidence to support the finding.

Finally, mother argues that the trial court should not have considered the family's prior contact with DCF in finding her unfit. Mother argues that the prior DCF contacts

25

were not a valid reason for termination because most of the reports to DCF were unsubstantiated. Nevertheless, Lewis testified about the family's prior contact with DCF. The family's contact with DCF shows that the family has had many problems over the years and has failed to adjust their circumstances. Accordingly, the trial court did not err in considering this information. Moreover, like mother's preceding argument, even if the trial court erred in considering this information, this error was harmless given the weight of the evidence supporting the trial court finding of unfitness.

*Are Father's Arguments Meritless?*

On appeal, father merely asserts that the trial court's finding was unreasonable given that (1) he communicated with his children when he could, (2) there was no evidence that he neglected his children, and (3) there was no evidence that he physically, mentally, or emotionally neglected his children. Father's arguments, however, are totally unpersuasive. Whether father communicated with his children is irrelevant to the trial court's finding of unfitness. Moreover, even if father did not neglect his children this facts is of little significance given the weight of the evidence supporting the trial court's finding of unfitness. As previously detailed, the trial court listed several reasons in support for its finding that father was unfit. The fact father stayed in contact with his children does nothing to mitigate the evidence supporting that he committed acts of domestic violence, emotionally abused his children, sexually abused his children, and is incarcerated until 2021. Consequently, father's arguments on appeal are meritless.

*Conclusion*

Although parents attempt to undermine the trial court's order terminating their parental rights by attacking the factual findings that trial court made in support of termination, testimony at the termination hearing supported each of the trial court's findings. Moreover, neither mother nor father provided this court with any persuasive

arguments as to why the trial court erred in making these findings. Accordingly, the trial court's finding that parents were unfit, parents were unlikely to change in the foreseeable future, and that termination of their parental rights was in the best interests of children was supported by clear and convincing evidence. As a result, we affirm the trial court's order terminating father's and mother's parental rights.

Affirmed.